*In re* ADOPTION OF JOHN PETER RICH, a Minor.—(PETER RICH *et al.*,
Petitioners-Appellants, *v.* JOHN PERRY RICH *et al.*, Respondents-Appellees.)

First District (3rd Division)   No. 76-335

Opinion filed July 27, 1977.—Rehearing denied August 31, 1977.

Gerald W. Getty, of Getty and Getty, of Dolton, for appellants.

Thomas P. Panichi, of Panichi and Vlasek, of Lansing, for appellees.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Petitioners, Peter Rich and Amanda Rich, filed a petition to adopt their seven-year-old grandson, John Peter Rich (hereinafter John Peter). The child's natural father and petitioner's son, John Perry Rich (hereinafter John Perry), contested the petition which charged him with unfitness on the grounds of desertion and abandonment. The minor's natural mother consented to the adoption, and is not a party to the appeal. After extended hearings, the trial court denied the petition on the basis that the alleged grounds for unfitness had not been proved.

Petitioners contend on appeal that the trial court erred in not finding John Perry to be an unfit parent on the ground of desertion. Additionally, they maintain that the trial court erred in not finding him unfit on the grounds of depravity, drunkenness, fornication, adultery, and in failing to consider the course of conduct exhibited by him during his adult life in arriving at its determination.

The adoption petition was filed on November 28, 1973, and, as amended, alleged that John Peter lived with and had been raised by petitioners in Thornton, Illinois; that the child was born to the natural mother at a time when John Perry was living with her but was married to another woman; that John Perry and the natural mother did not marry each other until the child was one year old; that John Perry had custody of the child pursuant to a divorce from the natural mother; and that the consent of John Perry was unnecessary because he was unfit as a parent, having abandoned and deserted the child for a period in excess of three months preceding the filing of the petition.

John Perry initially moved to dismiss the petition on the grounds that he had contributed to his son's support and that the petitioners had refused to permit him to take the child from their home. Thereafter, he filed an answer to the amended petition, denying that petitioners had legal custody of his son and denying the allegation of his unfitness. He also alleged that he had raised the child, and requested custody of the child or reasonable visitation privileges. The trial court entered no order on his request for custody.

The record discloses that John Perry had been granted custody of a second child under the aforementioned divorce decree. That child had been adopted by John Perry's brother and sister-in-law prior to the commencement of these proceedings. It apparently developed during the earlier adoption proceedings that John Perry was not the natural father of the second child.

Petitioners' evidence disclosed that John Peter was born on December 16, 1965. The natural mother had lived with John Perry, during which time the latter was married to another woman. The natural mother and

John Perry married in December 1966, and resided in an apartment about a block from the petitioners' home. The natural mother testified that she left the children and John Perry about three months after the marriage principally because the latter periodically came home and beat her and the children. She stated that such conduct would occur at monthly intervals, and that he had quit his job shortly after the marriage. His prior wife was living in California with a child of that marriage.

Petitioners' evidence further showed that on the morning his wife left him in April 1967, John Perry took his son and the second child to petitioners' home. He resided in his own apartment, and the children stayed with the petitioners. John Perry then moved into petitioners' home and resided there "on and off." After the second child's adoption, their grandson remained with petitioners. In February 1971, petitioners informed John Perry that he would have to move because of his drinking. Thereafter, he slept in his automobile and wandered about for a period of time. He stayed for about six months with a friend, and lived in hotels and motels. In September 1973, John Perry moved into an apartment in Hammond, Indiana, with Mary Simpson. They had worked together on occasion, and he had known her about a year. After John Perry's divorce in August 1973, he married Mary Simpson in November 1973. This approximated the time the present petition was filed. In his marriage license application, John Perry gave petitioners' home as his address. He explained at trial that he had always used it as his mailing address. In the same application, Simpson gave the address of a relative in Elmwood Park. She explained that she lived both there and in Hammond.

Petitioners' evidence further disclosed that they had expected no financial support from John Perry for care of their grandson when the latter was brought to their home in 1967 because the child had been born prematurely and John Perry had incurred substantial medical bills. Petitioners related, however, that they subsequently asked John Perry for financial support for the child. While he never actually refused to give them support, he "just never came through." Petitioners stated that he was employed in seasonal work, but there was no "pattern" to his support. They related that John Perry took the child for a kindergarten physical examination once, and that he paid certain medical bills. He also bought the child toys, a bed, bicycle, and clothing. He purchased no groceries or staples, but did bring the child "snack food" on occasion. He also took the child to the museum and to the zoo. Petitioners took the child to their summer home in Minnesota every year, and once John Perry and Simpson flew there for a short visit. John Perry had visited the child almost every day in the winters of 1972 and 1973, but had visited him only four or five times between the summer of 1973 and the filing of the present petition. He did visit the child on December 16 and 25, 1973. Since the filing of the

petition the visits have been less frequent because petitioners refused to permit the child to be taken from the home. Petitioners related that while John Perry and his son show affection for each other, the child "almost never" asks about John Perry, who "has not proved to be much of a father." Petitioners stated that they paid for all of John Peter's needs including school and medical expenses. The child was doing very well in school.

Both John Perry and his present wife, Mary, were called by petitioners as witnesses pursuant to section 60 of the Civil Practice Act. (Ill. Rev. Stat. 1973, ch. 110, par. 60.) They resided in Steger, Illinois, in a home which they intended to purchase. John Perry testified that he paid all of his son's medical bills and bought him clothing in 1972. In 1973 he gave his son only gifts because the petitioners refused to accept money which he had offered to them for the child's benefit. He paid for the child's dental work and for a pair of eyeglasses. He stated that he did not know whether the boy had another pair of eyeglasses because "no one is telling me what is going on." John Perry stated that his mother had made it more difficult for him to see the child after filing this adoption petition. John Perry stated that he had registered his son for kindergarten and first and second grades. He had paid for the child's inoculations and for other medical expenses. He also purchased clothing for the boy. John Perry's wife testified that she knew John Peter well because her husband had taken them out as a group.

Two cousins testified in behalf of John Perry. They stated that they were neighbors of petitioners, and that John Perry was a frequent visitor to petitioners' home while his son was there. Additionally, Reverend Theodore Staudacher, pastor of the St. Paul Lutheran Church from 1965 to 1974, testified in behalf of John Perry. All the parties to the adoption proceedings were members of his congregation and he knew them well. When the witness first met John Perry in 1965 or 1966, the latter was unruly and a heavy drinker. John Perry started to attend church regularly about a year before he married his present wife, Mary. The couple attended marriage counseling sessions, and the minister performed their marriage ceremony in November 1973. When the witness was transferred to another assignment in May 1974, John Perry was a different man than when they first met. In forming his judgment that John Perry was a good person, the clergyman testified that he was aware of John Perry's prior lifestyle.

The caseworker assigned to investigate the adoption petition also testified on behalf of John Perry. She had interviewed the petitioners and John Peter individually and believed that the child was well cared for physically. He was unaware that he was being adopted. John Peter seemed confused about his father. The child had asked the grandmother

about his father, and she told the child that he had been found in the street. The grandfather informed the caseworker that John Perry was a drunkard and not entitled to the child. Petitioners told the caseworker that John Perry rarely visited the child because they would not permit him to take the child out of their home. The grandmother feared that otherwise the child would not be returned home, and additionally she did not wish the child to be near John Perry's present wife. Petitioners informed the caseworker that John Perry bought the child eyeglasses, clothing, a bed and gifts for birthdays and holidays. He also paid for the child's medical shots and school checkups.

John Perry's home at the time of the interview was described as adequate and clean, but too small for a family. The couple told the caseworker that they would move to a larger residence if they obtained custody of John Peter. In making her recommendation, the caseworker considered the grandfather's age. She also considered John Perry's prior marriage and drinking, and that he had lived with Mary Simpson prior to their marriage. The witness was unaware that John Perry had lived with several women after leaving petitioners' home and prior to his marriage to Mary. The child had related some good experiences he had with John Perry, and the witness believed that a good relationship could be built between father and son.

Petitioners first contend that the trial court erred in not finding John Perry unfit on the ground of desertion.

■■ ■ Unfitness of a natural parent, who does not consent to the adoption of his child, must be proved by clear and convincing evidence within the terms of the Adoption Act. (*Peyla v. Martin* (1976), 40 Ill. App. 3d 373, 352 N.E.2d 407.) A determination by the trial court, sitting as the trier of fact, with the best opportunity to observe the witnesses, their conduct and demeanor while testifying, will not be disturbed on appeal unless that determination is palpably against the weight of the evidence. (*Mateyka v. Smith* (1964), 47 Ill. App. 2d 1, 197 N.E.2d 157.) Desertion, under the Adoption Act, has been defined as the intention by a natural parent to permanently terminate custody of his child while not relinquishing all parental rights and obligations. Abandonment has been defined as the complete relinquishment of parental rights and obligations. Ill. Rev. Stat. 1973, ch. 4, pars. 9.1—1(D)(a) and (c); *Thorpe v. Thorpe* (1964), 48 Ill. App. 2d 455, 198 N.E.2d 743.

■■ The record does not indicate an intention on the part of John Perry to relinquish custody of his son. The father had visited the child frequently, had purchased gifts and clothing for him, and had paid medical bills for the boy. Additionally, the father testified that he did not intend to desert or abandon the child. Significantly, the grandmother testified that her son visited the child on an almost daily basis during the

winters of 1972 and 1973, and that she placed the restrictions on the nature of the visits about the time of the commencement of these proceedings. It should be noted also that the present petition was filed approximately at the time of John Perry's marriage to his present wife, and that the grandmother told the caseworker that they did not wish the child to associate with the present wife. In view of the facts adduced of record which were considered by the trial court, it cannot be said that the court erred in finding that petitioners failed to prove by clear and convincing evidence that John Perry was unfit by reason of desertion.

██ The petitioners also contend that the trial court should have found the natural father unfit on the ground of depravity, drunkenness, adultery, fornication, and should have based its determination upon the natural father's course of conduct over many years of his adult life. However, we will not consider these remaining contentions. Since they relate to grounds for unfitness which were not pleaded in either the original or the amended petition, they cannot be urged in this court for the first time. (*In re Petition of Smith* (1972), 4 Ill. App. 3d 261, 280 N.E.2d 770; Ill. Rev. Stat. 1973, ch. 4, par. 9.1—5(B)(f).) Although such deficiency in the pleadings was called to petitioners' attention by objection raised at trial to the presentation of evidence relating to those further grounds, no effort was made to amend the pleadings to include any additional grounds for unfitness. (See *Thorpe v. Thorpe*.) Moreover, although the trial court permitted introduction of evidence relating to these charges which were not pleaded, it entered no finding of unfitness on the additional grounds. See *Tiernan v. Stewart* (1975), 33 Ill. App. 3d 545, 338 N.E.2d 153.

For the reasons stated, the order of the circuit court of Cook County denying the petition for adoption is affirmed.

Order affirmed.

SIMON, P. J., and JIGANTI, J., concur.